IN THE UNITED STATES DISTRICT COURT
NORTHERN DISTRCT OF OHIO
EASTERN DIVISION

| | |
|---|---|
| MICHEAL LEE BROTHERWOOD, | ) CASE NO. 3:19-CV-01753-JZ |
| | ) |
| Plaintiff, | ) |
| | ) JUDGE JACK ZOUHARY |
| vs. | ) UNITED STATES DISTRICT JUDGE |
| | ) |
| COMMISSIONER OF SOCIAL | ) MAGISTRATE JUDGE |
| SECURITY, | ) JONATHAN D. GREENBERG |
| | ) |
| Defendant. | ) **REPORT & RECOMMENDATION** |
| | ) |
| | ) |

Plaintiff Michael Lee Brotherwood ("Plaintiff" or "Brotherwood") challenges the final decision of Defendant, Andrew Saul,[1] Commissioner of Social Security ("Commissioner"), denying his application for a Period of Disability ("POD") and Disability Insurance Benefits ("DIB") under Title II of the Social Security Act, 42 U.S.C. §§ 416(i), 423, 1381 *et seq.* ("Act"). This Court has jurisdiction pursuant to 42 U.S.C. § 405(g). This case is before the undersigned United States Magistrate Judge pursuant to an automatic referral under Local Rule 72.2(b) for a Report and Recommendation. For the reasons set forth below, the Magistrate Judge recommends that the Commissioner's final decision be AFFIRMED

## I. PROCEDURAL HISTORY

In May 2016, Brotherwood filed an application for POD and DIB, alleging a disability onset date of April 15, 2016 and claiming he was disabled due to "multiple sclerosis (permanent cognative [sic] issues)." (Transcript ("Tr.") 15, 237.) The application was denied initially and upon reconsideration, and Brotherwood requested a hearing before an administrative law judge ("ALJ"). (*Id.* at 15.)

---

[1] On June 17, 2019, Andrew Saul became the Commissioner of Social Security.

1

On February 27, 2018, an ALJ held a hearing, during which Brotherwood, represented by counsel, and an impartial vocational expert ("VE") testified.  (*Id.*)  On July 5, 2018, the ALJ issued a written decision finding Brotherwood was not disabled.  (*Id.* at 15-27.)  The ALJ's decision became final on June 2, 2019, when the Appeals Council declined further review.  (*Id.* at 1-6.)

On August 2, 2019, Brotherwood filed his Complaint to challenge the Commissioner's final decision.  (Doc. No. 1.)  The parties have completed briefing in this case.  (Doc. Nos. 9, 12.) Brotherwood asserts the following assignments of error:

(1)     ALJ Carey's actions, findings[,] and conclusions are not supported by substantial evidence; and

(2)     ALJ Carey failed to properly evaluate the physician's opinion, including the weight given.

(Doc. No. 9 at 3, 5.)

## II.     EVIDENCE

### A.     Personal and Vocational Evidence

Brotherwood was born in August 1974 and was 43 years-old at the time of his administrative hearing (Tr. 26), making him a "younger" person under Social Security regulations.   20 C.F.R. § 404.1563(c).  He has at least a high school education and is able to communicate in English.  (Tr. 26.)  He has past relevant work as a warehouse worker and group leader/supervisor.  (*Id.*)

2

**B.      Medical Evidence[2]**

On September 22, 2015, Brotherwood underwent a neuropsychological evaluation with Bruce Ladle, Ph.D., after being referred by Natasha Alexander, D.O., Brothereood's treating neurologist, "to assess his current cognitive strengths, limitations, and emotional adjustment secondary to concerns of short-term memory secondary to multiple sclerosis."  (Tr. 325.)  Brotherwood's records reflected complaints of cognition difficulties for the past one and a half years, but there did not appear to be any sign of exacerbation of his MS.  (*Id.*)  Brotherwood reported he felt his memory had gotten worse over the past six months.  (*Id.*)  He complained of difficulty understanding instructions from his wife and following commands at work.  (*Id.*)  Brotherwood told Dr. Ladle he was still driving with no issues.  (*Id.*)

Brotherwood reported he had increased depression and anxiety over the past two years, but that he felt better when he took his medication.  (*Id.*)  Lexapro was helpful.  (*Id.*)  At the time of the evaluation, Brotherwood worked "40+" hours a week driving a forklift and working as a stock picker.  (*Id.* at 326.)  He recently received a written warning because his productivity was 18% less than everyone else.  (*Id.*)  Brotherwood reported having issues with his short-term memory at work, that there was too much going on around him for his mind to keep up.  (*Id.*)  He takes Provigil, which helped "'a little bit' with his concentration at work."  (*Id.*)  Brotherwood stated he felt his thinking speed has decreased and he had a harder time making decisions than before.  (*Id.*)  He did not feel safe driving a forklift anymore.  (*Id.*)

---

[2] The Court's recitation of the medical evidence is not intended to be exhaustive and is limited to the evidence cited in the parties' Briefs.  Brotherwood's counsel did not include any statement of medical evidence of facts in his brief.  (Doc. No. 9.)  Rather, he "respectfully requested that the pre-hearing brief previously submitted, which contains a concise summary of the medical record in this case, be incorporated reference."  (*Id.* at 5.)  Pre-hearing briefs submitted to the ALJ in advance of the hearing serve a different purpose than briefs before this Court on judicial review.  Such a request indicates an unwillingness by counsel to put in adequate time and effort to represent his client on judicial review and will not be tolerated in the future.

3

Brotherwood told Dr. Ladle he enjoyed buying, selling, and restoring cast iron cookware.  (*Id.*)  He also used to enjoy fishing.  (*Id.*)

On examination, Brotherwood wore a dirty shirt, had "unkempt and somewhat dirty" nails, tended to stare blankly if he did not know the answer to a question, and requested a break halfway through to help him better maintain his concentration and focus.  (*Id.*)  Brotherwood demonstrated fluent, spontaneous speech.  (*Id.* at 326-27.)  Dr. Ladle found Brotherwood had a "somewhat flat" affect and a dysphoric mood.  (*Id.* at 328.)  Brotherwood appeared "quite anxious" about his inability to keep up at work.  (*Id.*)  Brotherwood reported his appetite was good, his sleep was pretty good although he was tired a lot, but his libido was decreased.  (*Id.*)  Brotherwood also stated he felt "mildly depressed and anxious at times."  (*Id.*)  He told Dr. Ladle he got frustrated at work, especially when he could not do what he was doing before.  (*Id.*)

Dr. Ladle found Brotherwood's verbal fluency to be in the mildly impaired range.  (*Id.* at 327.)  Brotherwood had a full-scale IQ of 81, which was in the low average range.  (*Id.*)  Brotherwood's immediate and delayed recall of verbal information were in the low average and moderately impaired ranges, respectively.  (*Id.*)  Brotherwood's immediate and delayed recall of visual information was in the mildly impaired and moderately impaired ranges, respectively.  (*Id.*)  Brotherwood's ability to learn "novel verbal information across trials demonstrated a flat learning curve and was in the severely impaired range."  (*Id.*)  A self-report measure placed Brotherwood in the moderate range of depression.  (*Id.* at 328.)  Dr. Ladle noted Brotherwood "endorsed significant feelings of depression which appears secondary to the different physical complaints that he is experiencing at this time."  (*Id.*)

Dr. Ladle provided the following summary:

> Based upon the results of this neuropsychological evaluation, Mr. Brotherwood's intellectual abilities are in the low average range.  He demonstrated significant impairment with his attention/concentration.  His

4

> language appeared to be fairly intact, except for decreased verbal fluency. His higher level reasoning appeared to be relatively intact. He demonstrated low average to moderately impaired short-term memory for verbal information. His ability to learn verbal information across trials was severely impaired.
>
> * * *
>
> In summary, it appears that Mr. Brotherwood is experiencing significant cognitive concerns (Mild Cognitive Impairment) secondary to the MS and emotional adjustment concerns. There does not appear to be any other type of diagnostic reason for Mr. Brotherwood to be struggling to this extent with his cognition other than cognitive changes due to multiple sclerosis and emotional adjustment concerns.

(*Id.*)

On May 26, 2015, Brotherwood saw Dr. Alexander for follow up. (*Id.* at 360.) Brotherwood reported doing okay since his last visit, although he had been having short-term memory issues. (*Id.*) He stated he could not think straight and was having problems making decisions in the moment at work. (*Id.*) He told Dr. Alexander he had no problems with his long-term memory. (*Id.*) Brotherwood reported sleeping well, and while his fatigue was still present, it was better with Provigil. (*Id.*) Dr. Alexander noted anxiety and depression were not present. (*Id.* at 361.) On examination, Dr. Alexander found intact sensation to light touch, temperature, and pinprick in the upper and lower extremities, as well as normal strength and muscle tone in the upper and lower extremities. (*Id.* at 362.) Dr. Alexander increased Brotherwood's dosage of Provigil. (*Id.*)

On September 8, 2015, Brotherwood again saw Dr. Alexander for follow up. (*Id.* at 356.) Brotherwood reported his biggest concern was his short-term memory, which had been worse over the past two months. (*Id.*) Brotherwood told Dr. Alexander he was unable to follow instructions from his wife and struggled to follow commands at work. (*Id.*) Dr. Alexander noted anxiety and depression were not present. (*Id.* at 357.)

On examination, Dr. Alexander found a normal affect, no impairment of word comprehension or word repetition, normal thought content/perception, and appropriate fund of knowledge.  (*Id.* at 358.)  Dr. Alexander determined Brotherwood had intact sensation to light touch, temperature, and pinprick in his upper and lower extremities, as well normal strength and tone.  (*Id.*)  Dr. Alexander's impression of Brotherwood's memory change consisted of the following: "Recent cognitive issues most notably over the past 1-2 months.  No signs of infection. Likely secondary to his underlying MS.  Of note, lesion load has remained relatively stable.  Repeat images in December.  Possible OSA, which could be contributing." (*Id.*)

On December 3, 2015, Brotherwood underwent MRI of his brain and spine.  (*Id.* at 388-89.) The brain MRI revealed "[n]o significant appreciable change since 12/18/14."  (*Id.* at 388.)  The MRI of Brotherwood's cervical spine was normal.  (*Id.* at 389.)

On December 29, 2015, Brotherwood saw Peter Maceroni, Jr., D.O., for complaints that his memory was becoming worse.  (*Id.* at 351.)  Brotherwood reported his family doctor changed his medication from Lexapro to Effexor but he did not like it, so he switched back to an increased dose of Lexapro.  (*Id.*)  Brotherwood said he felt a little bit better on the higher dose of Lexapro, but it had not helped with his memory problems.  (*Id.*)  Brotherwood told Dr. Maceroni he would be interested in seeing a mental health professional for his depression and emotional concerns.  (*Id.*)  On examination, Dr. Maceroni found normal affect, speech, and thought content/perception.  (*Id.* at 354.)  Brotherwood demonstrated intact sensation to light touch, normal strength, and normal tone of the upper and lower extremities.  (*Id.*)  Dr. Maceroni discussed Brotherwood's recent MRI results. (*Id.* at 351.)  Dr. Maceroni ordered Brotherwood to continue Lexapro and referred him to the Coleman Center for counseling.  (*Id.* at 354.)  Dr. Maceroni noted Brotherwood's cognitive issues

6

were "[l]ikely secondary to his underlying MS. Of note, lesion load has remained relatively stable. Repeat images in December.  Possible OSA, which could be contributing."  (*Id.*)

On January 11, 2016, Brotherwood saw Sarat Kuchipudi, M.D., for follow up of a home sleep study.  (*Id.* at 455.)  While the sleep study showed no significant obstructive sleep apnea, it did reveal a significant amount of snoring events and 193 minutes where Brotherwood's saturations were running below 89%.  (*Id.*)

On March 30, 2016, Brotherwood saw Dr. Alexander for follow up.  (*Id.* at 346.)  Brotherwood reported things could be better, as he was very fatigued and his memory was not good.  (*Id.*)  He was also having issues at work because of difficulty focusing and memory problems.  (*Id.*)  Brotherwood stated he was unaware of any recent flare up of his MS.  (*Id.*)  Dr. Alexander noted Brotherwood's primary care physician, Dr. Josey, was making adjustments to his anti-depressants and that Brotherwood had not gone to the Coleman Center.  (*Id.*)  Brotherwood's MS was stable.  (*Id.*)

On examination, Dr. Alexander found a normal affect, no impairment of word comprehension or word repetition, normal thought content/perception, and appropriate fund of knowledge.  (*Id.* at 349.)  Dr. Alexander determined Brotherwood had intact sensation to light touch in his upper and lower extremities, as well as normal strength and tone.  (*Id.*)

On May 3, 2016, Brotherwood again saw Dr. Alexander.  (*Id.* at 342.)  Treatment records reflect complaints of numbness in his right thigh.  (*Id.*)  The numbness went from the middle to the lateral side of his leg, and from his knee up to his hip.  (*Id.*)  The numbness occasionally got worse, but it did not affect his walking.  (*Id.*)  Sometimes the numbness was burning.  (*Id.*)  He also experienced numbness in his arms if he did not move them.  (*Id.*)  He also complained about his short-term memory, which he felt had been worse the past one to two months.  (*Id.*)  Regarding Brotherwood's MS, his symptoms included dizziness and sensory symptoms in the right facial area, which Brotherwood described as mild and

7

unchanged.  (*Id.*)  "Associated symptoms include[d] fatigue (a lot) and difficulty concentrating (short term memory is not doing very well, this is worsen.) [sic], while associated symptoms do not include depression."  (*Id.*)  No symptoms suggested an MS exacerbation.  (*Id.*)  His last MS attack was in April 2014. (*Id.*)  His MS was stable.  (*Id.*)

On examination, Dr. Alexander found a normal affect, no impairment of word comprehension or word repetition, normal thought content/perception, and appropriate fund of knowledge.  (*Id.* at 344.) While Dr. Alexander determined Brotherwood had a decreased sensation to light touch on the right lateral thigh, he had normal strength and tone in his upper and lower extremities.  (*Id.*)  Dr. Alexander suspected lateral femoral cutaneous syndrome and recommended imaging if Brotherwood's symptoms worsened. (*Id.* at 345.)  Dr. Alexander noted Brotherwood's neuropsychological evaluation results showed mild cognitive impairment due to MS and emotional adjustment concerns, and that Brotherwood also had depression.  (*Id.*)  Dr. Alexander recommended a repeat study in September 2017.  (*Id.*)

On May 5, 2016, Brotherwood began receiving chiropractic treatment for his right lateral thigh pain and burning sensations.  (*Id.* at 399.)

A May 13, 2016 MRI of Brotherwood's lumbar spine revealed a "mild diffusely bulging disk" at L5-S1, with no evidence of disk herniation or spinal stenosis, as well as "[m]ild degenerative arthritis of the lower lumbar posterior articular facets."  (*Id.* at 383.)

On May 21, 2016, Brotherwood went to the emergency room for back pain.  (*Id.* at 419.) Brotherwood complained of sharp pain in his left flank when he twisted his body.  (*Id.* at 420.) Brotherwood had driven himself to the emergency room for treatment.  (*Id.*)  On examination, treatment providers found Brotherwood in moderate distress with a painful range of motion.  (*Id.* at 421.) Brotherwood's truncal range of motion was limited due to pain.  (*Id.*)  Brotherwood was able to perform

8

truncal rotation, lateral bending, flexion, squatting, and dorsi and plantar flexion.  (*Id.* at 421-22.)

Brotherwood was diagnosed with lumbar paraspinal muscle strain.  (*Id.* at 423.)

By June 9, 2016, Brotherwood reported to Tyler Lomnicki, D.C., he had "'[l]ess consistent

numbness, but standing for more than an our [sic] increase[d] burning sensation." (*Id.* at 405.)  By June

16, 2016, Lomnicki stated he no longer had "a reasonable expectation Mr. Brotherwood will experience

functional improvement, therefore, he has been offered maintenance care."  (*Id.* at 406.)

On June 24, 2016, Brotherwood saw Dr. Josey for disease management and follow-up.  (*Id.* at

409.)  Dr. Josey noted Brotherwood's depression was mild.  (*Id.* at 409-10.)  On examination, Dr. Josey

found Brotherwood had a normal mood and affect, was able to articulate well with normal

speech/language, rate, volume, and coherence, and no evidence of hallucinations, delusions, obsessions, or

homicidal/suicidal ideation.  (*Id.* at 412.)  Dr. Josey noted Brotherwood's depression was "relatively

controlled will continue with present level of treatment" and recommended counseling.  (*Id.* at 413.)

Brotherwood scored a 13 on the PHQ-9 scale,[3] which reflected moderate depression.  (*Id.* at 414.)

On August 4, 2016, Brotherwood saw Dr. Josey for continued low and mid-back pain.  (*Id.* at 513.)

Brotherwood also complained of numbness and burning in his right lateral thigh that had been going on

for weeks and was getting worse.  (*Id.*)  Brotherwood reported rest did not alleviate the numbness and

burning, and Neurontin did not help much with the discomfort.  (*Id.*)  Dr. Josey noted Brotherwood was

negative for anxiety, depression, and mood problems.  (*Id.* at 514.)  On examination, Dr. Josey found

Brotherwood's range of motion in his lower extremities was abnormal bilaterally, but he had normal

strength and movement.  (*Id.* at 516.)  Dr. Josey also found decreased sensation to light touch on the

---

[3] The PHQ-9 scale is a "nine item depression scale of the patient health questionnaire" that can be used "to assist clinicians with diagnosing depression and monitoring treatment response."  University of Washington, Psychiatry & Behavioral Sciences, Division of Population Health, AIMS Center, https://aims.uw.edu/resource-library/phq-9-depression-scale (last visited July 29, 2020).  The nine items "are based directly on the nine diagnostic criteria for major depressive disorder in the DSM-IV."  *Id.*

lateral right thigh.  (*Id.*)  Dr. Josey diagnosed meralgia paresthetica of the right side and ordered physical therapy.  (*Id.*)

On August 12, 2016, Brotherwood began physical therapy for his right leg.  (*Id.* at 696.) Brotherwood reported right leg pain from his groin to his knee, a burning pain with any prolonged standing, and numbness to the touch.  (*Id.*)  Brotherwood rated his current pain at a 0/10, his pain at best as a 0/10, and his pain at worst a 7-8/10.  (*Id.* at 697.)  Standing for more than one to one and a half hours aggravated his pain, while sitting down and sleeping alleviated it.  (*Id.*)  Lauren Schott, PT, recommended physical therapy twice a week for four weeks.  (*Id.* at 700.)

On August 25, 2016, Brotherwood saw Michael J. Wuebker, Ph.D., for a consultative examination. (*Id.* at 494-500).  Brother reported that he was filing for disability "on his own accord and upon the advice of his psychologist" because of "'Multiple sclerosis – I can't remember stuff.'"  (*Id.* at 494.)  Brotherwood told Dr. Wuebker he had a good relationship with parents.  (*Id.* at 495.)  While in school, Brotherwood attended regular classes and earned below average grades.  (*Id.*)  Brotherwood stated he stopped working in April 2016 because of he could not perform his job and be as productive as his employer liked.  (*Id.*) He noticed problems with staying focused and concentrating over the last few years.  (*Id.*)  However, he had no problem completing tasks and attendance was not an issue.  (*Id.*)  He also related adequately with co-workers and supervisors and he would socialize with others at breaks.  (*Id.* at 495-96.)   When asked how he believed others perceived him, he replied others probably thought he was a good worker, and that he did his job.  (*Id.* at 496.)  Brotherwood told Dr. Wuebker his bosses liked his work.  (*Id.*)  Dr. Wuebker noted Brotherwood "cited no dysfunctional behaviors or attitudes associated with dealing with stress." (*Id.*)  Brotherwood had never been fired.  (*Id.*)  He had not looked for work since he was last employed. (*Id.*)

10

Brotherwood reported vision problems, numbness in his extremities at times, back problems that radiate into his legs if he stands too long, burning in his leg, and being easily fatigued.  (*Id.*)  He told Dr. Wuebker he developed depression related to his MS about five or six years earlier.  (*Id.*)  However, he had never been hospitalized for mental health problems or participated in counseling.  (*Id.* at 57, 496.)  Brotherwood reported he took Lexapro for his depression and he could tell when he forgot to take it.  (*Id.*)  He stated he he had been taking Lexapro for the past two or three years.  (*Id.*)

On examination, Dr. Wuebker found Brotherwood to be clean, neat, and cooperative.  (*Id.* at 496.)  Brotherwood maintained adequate eye contact. (*Id.*)  Brotherwood demonstrated clear, understandable speech, with tone and pace within normal limits, as well as a logical and coherent thought process.  (*Id.* at 497.)   While Brotherwood reported feeling depressed, Dr. Wuebker found his mood was not depressed and his affect was appropriate.  (*Id.*)  Brotherwood rated his depression in the past two weeks as a 4-5/10. (*Id.*)  Brotherwood denied feeling anxious, and Dr. Wuebker noted no symptoms of anxiety were observed during the examination.  (*Id.*)

With respect to Brotherwood's sensorium and cognitive functioning, he: was oriented to person, place, time, and situation; was in contact with the examiner and demonstrated no clouding of consciousness; knew the date; counted backwards from twenty to one in eighteen seconds with no errors; performed serial-sevens; knew the name of the President of the United States and the name of the governor of Ohio; knew that nine times eight is seventy-two; and recalled one of three objects on a simple registration task after five minutes.  (*Id.*)  Dr. Wuebker noted Brotherwood "seemed to be functioning in the low average range of cognition."   (*Id.* at 498.) Dr. Wuebker found Brotherwood demonstrated adequate insight and the ability to make common sense judgments.  (*Id.*)

In terms of activities of daily living, Brotherwood reported he interacted with his dog and cat during the day, he liked to spend time restoring cast iron skillets, he visited with a few friends weekly and

with family twice weekly, he talked on the phone with his mother, and he was able to prepare simple meals, perform light cleaning tasks, and shop with a list.  (*Id.*)

Dr. Wuebker diagnosed Plaintiff with mild neurocognitive disorder – multiple sclerosis, other specified depressive disorder – recurrent brief depression, and low income.  (*Id.* at 499.)  Dr. Wuebker determined Brotherwood could be expected to understand and apply instructions consistent with his intellectual functioning. (*Id.*)  Dr. Wuebker opined Brotherwood's "cognitive and mental health issues would negatively impact his ability" to maintain attention, concentration, persistence, and pace and to perform simple and multi-step tasks in a work environment.  (*Id.*)  Dr. Wuebker noted Brotherwood exhibited no attitudes or behaviors that would indicate problems getting along with co-workers and supervisors.  (*Id.*)  Dr. Wuebker further opined Brotherwood would be able to respond to work stressors in line with his abilities.  (*Id.*)  Brotherwood gave no indication he would be unable to manage any funds should they be awarded.  (*Id.* at 500.)

On September 1, 2016, Brotherwood saw Dr. Alexander for his six-month follow up appointment. (*Id.* at 525.)  Brotherwood reported things had been okay, but he was having "a really hard time focusing and remembering things," and this had been worsening over the past few months.  (*Id.*)  Brotherwood also told Dr. Alexander he still struggled with fatigue and tiredness, although the Modafinil helped with his fatigue.  (*Id.*)  Brotherwood was scheduled to go back to work in a month and was hesitant to return because of his difficulty in focusing and remembering.  (*Id.*)  Dr. Alexander noted Brotherwood was undergoing physical therapy for his right thigh.  (*Id.*)

On September 9, 2016, Brotherwood was discharged from physical therapy.  (*Id.* at 687.)  Brotherwood reported a 60-70% improvement.  (*Id.*)  While he still experienced constant numbness to the touch and intermittent burning pain, he experienced leg pain only after standing for four hours.  (*Id.*)  Brotherwood complained of continued tightness in his low back when he woke up.  (*Id.*)

On September 30, 2016, Brotherwood saw Dr. Josey to discuss returning to work.  (*Id.* at 531.) Brotherwood reported he wanted to talk to Dr. Alexander about being written off work for five months as his symptoms had not changed and he had a hard time focusing and remembering things.  (*Id.*)  Dr. Josey noted Brotherwood may want to work in the future.  (*Id.*)   Brotherwood was positive for depression but negative for anxiety.  (*Id.* at 532.)  Dr. Josey referred Brotherwood to Coleman's for his memory change. (*Id.* at 534.)

On December 2, 2016, Brotherwood saw Dr. Josey to discuss quitting smoking and Lexapro.  (*Id.* at 552.)  Brotherwood told Dr. Josey he felt Lexapro was not helping his depression and was causing his erectile dysfunction to worsen.  (*Id.*)  While Brotherwood presented with a blunted mood and anxious affect, he was able to articulate well with normal speech/language, rate, volume, and coherence, and Dr. Josey found no evidence of hallucinations, delusions, obsessions, or homicidal/suicidal ideation.  (*Id.* at 555.)  Dr. Josey recommended Brotherwood follow up in six weeks.  (*Id.* at 556.)  Dr. Josey gave Brotherwood a list of telephone numbers for counselors in the area.  (*Id.*)  Brotherwood scored an 11 on the PHQ-9 scale, which reflected moderate depression.  (*Id.* at 557.)

On December 12, 2016, Brotherwood underwent a brain MRI.  (*Id.* at 721.)  The imaging revealed "mild to moderate MS plaque burden" again but which had "slightly decreased" and "[l]ow-grade left ethmoid sinusitis." (*Id.*)

On January 13, 2017, Brothrerwood saw Dr. Josey for a six-week follow-up appointment for his depression.  (*Id.* at 558.)  Dr. Josey noted Brotherwood's depression was improving and that his symptoms waxed and waned.  (*Id.*)  Brotherwood presented with a normal mood and affect, he was able to articulate well with normal speech/language, rate, volume, and coherence, and Dr. Josey found no evidence of hallucinations, delusions, obsessions, or homicidal/suicidal ideation.  (*Id.* at 562.)  Brotherwood reported he was doing okay considering his circumstances and his medication was helping him cope with stress.

13

(*Id.*)  Brotherwood scored a 16 on the PHQ-9 scale, which reflected moderate to severe depression.  (*Id.* at 563.)

On February 21, 2017, the Interventional Pain Management Center declined to schedule Brotherwood for evaluation and treatment, as a thorough record review revealed there were no interventional procedures the Center could offer to manage Brotherwood's pain.  (*Id.* at 1028.)

On March 14, 2017, Brotherwood saw John Buonocore, D.O., at the St. Mary's Pain Clinic for his low back and leg pain.  (*Id.* at 735.)  On examination, Dr. Buonocore found pain with axial loading on the right side, with occasional tender spots and trigger points noted on the right side with an L3-L5 distribution.  (*Id.* at 736.)  While sensation was "abnormally decreased" in the upper thigh and a mixed dermatomal pattern, gross motor strength was 5/5 in the lower extremities and straight leg raise was negative bilaterally.  (*Id.*)  Dr. Buonocore started Brotherwood on Gabapentin and scheduled a left lumbar medial branch block at the L3-L5 levels.  (*Id.*)

On April 24, 2017, Brotherwood underwent a right lumbar median branch block at the L3-L5 levels.  (*Id.* at 761.)

On May 5, 2017, Brotherwood saw William Schemmel, D.O., for assessment.  (*Id.* at 617.)  Dr. Schemmel found "no evidence for active optic neuropathy" related to Brotherwood's MS, but there was "evidence of decreased performance on visual field and a structural change within the eye (decreased nerve fiber layer thickness)" consistent with MS.  (*Id.*)  Treatment would center on Brotherwood's MS in the absence of active optic neuritis.  (*Id.*)

On May 22, 2017, David Louis, M.D., M.S., Medical Director for Crown Equipment Corporation, wrote a letter to Dr. Alexander asking for her opinion on whether Brotherwood could safely perform his job as a Warehousing DC in Crown's Distribution Center.  (*Id.* at 602-03.)  Dr. Louis stated he had administered a neuropsychological exam, the results of which "revealed significant impairment." (*Id.* at

14

602.)  Dr. Louis stated he had also received evidence of continued blurry vision and numbness in Brotherwood's feet and legs.  (*Id.*)  As a result, Dr. Louis told Dr. Alexander he was surprised she had released Brotherwood to full duty with only a restriction of allowing periods of rest after standing for four hours.  (*Id.* at 602-03.)

On June 6, 2017, Brotherwood saw James Kemmler, M.D., regarding the meralgia paresthetica of his right leg.  (*Id.* at 587.)  Brotherwood reported Cymbalta was providing relief and he was able to tolerate standing on his leg.  (*Id.*)  On examination, Dr. Kemmler found Brotherwood had difficulty with squats and toe touches due to tight hamstrings and iliotibial bands bilaterally.  (*Id.*)  Dr. Kemmler also found normal sensation of the bilateral lower extremities at this juncture, negative Tinel's sign over the lateral femoral cutaneous nerve, no pain in the groin with range of motion of either hip, mild global limitation of range of motion in the hips, no lumbosacral tenderness, and negative straight leg raises.  (*Id.*)  Brotherwood was able to actively heel raise and toe raise.  (*Id.*)  X-rays of the right hip revealed no significant degenerative changes.  (*Id.*)  X-rays of the lumbosacral spine revealed mild right sided list and minimal to no degenerative disc disease.  (*Id.* at 588.)  Dr. Kemmler told Brotherwood to continue with his medications and daily exercises and follow up in three months.  (*Id.*)

On June 13, 2017, Brotherwood saw Dr. Ladle for an updated neuropsychological examination.  (*Id.* at 636.)  Brotherwood reported his current medications consisted of Tecfidera for his MS, as well as Provigil and Cymbalta.  (*Id.*)  Brotherwood told Dr. Ladle Lexapro had been helpful, but it effected his libido and it was discontinued.  (*Id.* at 637.)  After that, Dr. Josey placed Brotherwood on Prozac, which also helped some.  (*Id.*)  However, Brotherwood began taking Cymbalta in the past two to three weeks "for pain concerns."  (*Id.*)  Brotherwood told Dr. Ladle he was doing part-time work selling cast iron skillets and wanted to apply for different kinds of factory jobs.  (*Id.*)  Brotherwood reported he enjoyed fishing as a leisure activity, and he was able to drive without difficulty.  (*Id.*)

15

While Brotherwood continued to complain of mild word search problems, he told Dr. Ladle it was "'not a concern.'"  (*Id.*)  Brotherwood reported he felt his attention and concentration were decreased and that he got distracted sometimes when multitasking.  (*Id.*)  Brotherwood also complained of decreased short-term memory and slower cognitive speed.  (*Id.*)

On examination, Dr. Ladle noted Brotherwood "had some difficulty and frustration on mental control type tasks."  (*Id.*)  Dr. Ladle found "some decrease" in Brotherwood's processing speed, and Brotherwood got frustrated on a verbal processing speed measure.  (*Id.*)  Dr. Ladle noted Brotherwood was "somewhat anxious and very frustrated."  (*Id.*)  During the evaluation, Brotherwood complained of mild leg pain.  (*Id.*)  At the end of the evaluation, Brotherwood complained of significant fatigue.  (*Id.*)

Dr. Ladle found Brotherwood's performance on measures of simple verbal attention and concentration were in the mildly impaired range.  (*Id.* at 638.)  Even on a more complex measure of verbal attention and concentration abilities, where he had to sequence numbers and letters, Brotherwood's abilities were again in the mildly impaired range.  (*Id.*)  On an arithmetic concentration measure, his abilities were in the average range.  (*Id.*)  Dr. Ladle determined it appeared Brotherwood's "attention and concentration abilities have improved some but are still in the average to mildly impaired range."  (*Id.*)  On a task of verbal fluency, Brotherwood performed in the moderately impaired range.  (*Id.*)  Dr. Ladle noted Brotherwood had performed "slightly better" the last time.  (*Id.*)

Dr. Ladle found Brotherwood's overall intellectual abilities were in the average to low average range, with "significant difficulty on tasks that assessed his visual processing speed."  (*Id.* at 639.)  Dr. Ladle determined Brotherwood's verbal comprehension and some of the attention and concentration measures had improved, but the difficulty he had with the processing speed tasks lowered his Full-Scale IQ score to 80.  (*Id.*)  Dr. Ladle stated as a result the General Ability Index was a better indicator of Brotherwood's overall intellectual abilities, "which may show some overall improvement, at least in his

16

intellectual functioning." (*Id.*)  Dr. Ladle also found Brotherwood "demonstrated significant improvement with his verbal short term memory," although his visual short term memory was in the moderately impaired to low average, which was similar to what it was before.  (*Id.*)

Dr. Ladle found Brotherwood's affect was "a little flat" and his mood was "mildly irritable and dysphoric."  (*Id.* at 640.)  A self-report measure placed Brotherwood in the severe range of depression. (*Id.*)  Dr. Ladle noted, "Overall, his emotional adjustment appears to be in many ways very similar, if not maybe a little more depressed now than before.  This level of increase in depression could very well be because he has lost his job and is not able to provide for his family and he cannot do things that he was doing before."  (*Id.*)

Dr. Ladle provided the following summary:

> Based on the results of this neuropsychological evaluation, Mr. Brotherwood's cognitive abilities ranged from the high average to severely impaired range.  However, the majority of his cognitive abilities have improved some from last time and are now more in the average to mildly impaired range versus the low average to severely impaired range when this evaluation was previously administered back in 2015.  His overall intellectual abilities appear to be in the low average range with difficulty on tasks that required visual and verbal processing speed.  His higher-level reasoning and problem solving abilities appear to be intact and in the average range . . .
>
> * * *
>
> From an emotional standpoint, Mr. Brotherwood appears to be somewhat more depressed this time than in the past due to being fired and an inability at this time to provide for his family.

(*Id.* at 641.)

Dr. Ladle opined due to delayed processing speed, it might be best for Brotherwood to avoid a factory-type position where success is measured by production within a time limitation.  (*Id.* at 642.)  He would be better suited to a job allowing him to work at his own pace.  (*Id.*)  Dr. Ladle also noted the

17

Cymbalta may not have reached its maximum level of effectiveness and that Brotherwood may benefit from counseling.  (*Id.*)

On June 26, 2017, Brotherwood saw Dr. Josey for disease management.  (*Id.* at 987.)  Dr. Josey noted Brotherwood's depression was improving and his symptoms were waxing and waning.  (*Id.*)  The pain management center stopped his Prozac and put him on Cymbalta.  (*Id.*)  While the Cymbalta helped his meralgia paresthetica, his depression symptoms were worse.  (*Id.*)  Dr. Josey found normal muscle strength and movement of the upper and lower extremities.  (*Id.* at 990.)  Brotherwood presented with an agitated mood and affect, but he was able to articulate well with normal speech/language, rate, volume, and coherence, and Dr. Josey found no evidence of hallucinations, delusions, obsessions, or homicidal/suicidal ideation.  (*Id.*)  Dr. Josey told Brotherwood to call in two weeks and update him on his depression symptoms and meralgia paresthetica with an increase in Cymbalta and follow up in three months.  (*Id.* at 991.)

On July 20, 2017, Brotherwood saw Dr. Kemmler for follow up.  (*Id.* at 651.)  Brotherwood reported continued pain, numbness, and tingling from his right lateral knee to hip that was aggravated with prolonged standing.  (*Id.*)  While Cymbalta helped at first, Brotherwood felt the Cymbalta was not doing anything now.  (*Id.*)  Brotherwood also asked Dr. Kemmler for a refill of his Gabapentin as he was no longer going to pain management.  (*Id.*)  On examination, Dr. Kemmler found the same physical findings as before.  (*Id.*)  Dr. Kemmler gave Brotherwood an injection in the most sensitive area and told Brotherwood to return in three weeks for evaluation.  (*Id.* at 652.)

On August 3, 2017, Brotherwood saw Dr. Kemmler for a follow-up steroid injection.  (*Id.* at 653.)  Brotherwood reported no significant change.  (*Id.*)  Brotherwood reported he wished to proceed with surgical excision of the lateral antebrachial cutaneous nerve on the right side.  (*Id.* at 654.)

On September 26, 2017, Brotherwood saw Dr. Josey for a three-month follow-up for his depression.  (*Id.* at 574.)  Dr. Josey noted Brotherwood was "feeling slightly better on Cymbalta however there is still a lot of anger regarding his diagnosis is [sic] and its impact on his life."  (*Id.*)  Dr. Josey further noted Brotherwood had not started counseling.  (*Id.*)  On examination, Dr. Josey found Brotherwood presented with a blunted mood and affect, but he was able to articulate well with normal speech/language, rate, volume, and coherence, and Dr. Josey found no evidence of hallucinations, delusions, obsessions, or homicidal/suicidal ideation.  (*Id.* at 578.)  Dr. Josey stated he would continue present treatment.  (*Id.*)  Dr. Josey noted he encouraged Brotherwood to seek counseling, however "he was resistant at this time."  (*Id.*)

On November 8, 2017, Brotherwood underwent excision of the lateral femoral cutaneous nerve at and distal to the ilioinguinal ligament.  (*Id.* at 648.)

On November 21, 2017, Brotherwood saw Dr. Kemmler for a follow up of his excision.  (*Id.* at 655.)  Brotherwood reported some soreness.  (*Id.*)  Dr. Kemmler noted mild skin irritation and pinkness, as well as slight moistness along the suture line, but no drainage.  (*Id.*)  Dr. Kemmler found the incision site well-healed.  (*Id.*)  On examination. Dr. Kemmler found full range of motion of the right lower extremity with no assistive device during ambulation.  (*Id.*)  Dr. Kemmler removed Brotherwood's sutures.  (*Id.*)  Dr. Kemmler encouraged Brotherwood to continue with an active lifestyle and follow up as needed.  (*Id.* at 656.)

On November 22, 2017, Brotherwood saw Elizabeth Osborne, LISW, LSW, LICDC, at the Coleman Center for a diagnostic assessment.  (*Id.* at 661.)  Brotherwood reported his neurologist, a psychologist in Dayton, and his primary care provider recommended he come for counseling.  (*Id.*)  He told Osborne he had issues with depression, and his memory and cognition were not good.  (*Id.*)  Brotherwood also said things were not good at home.  (*Id.*)  Brotherwood reported he wanted to work but

19

he could not remember anything, so he did not think he could hold a job.  (*Id.* at 664.)  In addition, if he did find a job, Social Security would dismiss his case.  (*Id.*)  Brotherwood told Osborne Cymbalta was "useless" and his primary care provider was going to try Prozac.  (*Id.* at 665.)

Osborne noted he had a depressed outlook although he did smile at times during the assessment.  (*Id.* at 661.)  On examination, Brotherwood demonstrated fair eye contact, clear speech, a depressed mood, a full and constricted affect, logical thought process, unremarkable thought content, unremarkable cognitive impairment, and fair insight and judgment.  (*Id.* at 673-74.)  Osborne diagnosed Brotherwood with depressive disorder due to another medical condition, with mixed features.  (*Id.* at 677.)

On December 11, 2017, Brotherwood saw Osborne for a counseling session.  (*Id.* at 657.)  Brotherwood presented with a "slightly restricted affect" and "stiff back."  (*Id.*)  Osborne noted Brotherwood was clean and dressed appropriately for the weather.  (*Id.*)  On examination, Osborne found Brotherwood cooperative, with average eye contact, slowed activity, pressured speech, a depressed and restricted mood, a constricted affect, and a circumstantial thought process.  (*Id.* at 657-58.)  However, he reported he was working at a butcher shop with his father-in-law "when he is capable."  (*Id.* at 658.)  Although Brotherwood was slow, his father-in-law did not complain.  (*Id.*)  Additionally, Brotherwood reported his coping strategies or techniques included working on cast iron skillets, attending online meetings and multiple sclerosis support groups, and helping his father-in-law.  (*Id.*)

On December 13, 2017, Brotherwood saw Margrete Irish-Pearson, CNP, for an adjustment to his medication.  (*Id.* at 680.)  Brotherwood reported having depression and feeling he had short-term memory issues, difficulty in decision making, and slowed reaction times.  (*Id.*)  Brotherwood told Irish-Pearson he was trying to work in a butcher shop.  (*Id.*)  Brothewood reported he had been on Lexapro but had side effects, then was on Prozac, and then was switched to Cymbalta after a month by the pain clinic.  (*Id.*)  On examination, Irish-Pearson found Brotherwood's demeanor/behavior to be average, mistrustful, and

cooperative.  (*Id.* at 682.)  Brotherwood presented with clear speech, normal eye contact, a depressed mood, congruent affect, a logical and concrete thought process, and unremarkable thought content.  (*Id.*)  Irish-Pearson found unremarkable cognition/orientation, with memory recent/remote intact and orientation to all spheres.  (*Id.*)  CNP Irish-Pearson directed Brotherwood to wean off Cymbalta and cross-titrate with Wellbutrin.  (*Id.* at 683.)

On January 8, 2018, Brotherwood saw Osborne for another counseling session.  (*Id.* at 1059.)  Osborne noted Brotherwood sometimes had his head down and was talking quietly during the session, while other times he had a smile and fair eye contact.  (*Id.*)  Brotherwood reported he had joined the cast iron guild.  (*Id.*)  His medication had changed, and he was getting along better with his wife.  (*Id.*)  On examination, Osborne found Brotherwood presented with an average demeanor, cooperative behavior, average eye contact, slowed activity, pressured speech, and constricted affect.  (*Id.*)  Brotherwood demonstrated a logical thought process and fair insight and judgment.  (*Id.* at 1060.)  Brotherwood reported he was working on cast iron to help pay for a cruise that his wife wanted to go on, and he continued to work part-time in the butcher shop with his father-in-law when he was able.  (*Id.*)  Brotherwood also stated he helped around the house.  (*Id.*)  Osborne noted Brotherwood told her his "depression has decreased with challenging thoughts and taking medication. . . ."  (*Id.* at 1062.)

On January 29, 2018, Brotherwood saw Osborne for a counseling session.  (*Id.* at 1063.)  Osborne noted Brotherwood was easily distracted during the session.  (*Id.*)  Brotherwood reported he felt like people at work were not listening to him.  (*Id.*)  Osborne found Brotherwood presented with an average demeanor, cooperative behavior, average eye contact, slowed activity, pressured speech, frustrated and doubtful mood, constricted affect, and tangential thought process.  (*Id.* at 1063-64.)  Brotherwood demonstrated fair insight and judgment.  (*Id.* at 1064.)  Brotherwood reported his depression had decreased.  (*Id.*)

On February 27, 2018, Brotherwood saw CNP Irish-Pearson for an adjustment to his medication. (*Id.* at 1075.)  CNP Irish-Pearson directed Brotherwood to wean off Wellbutrin and start Letuda.  (*Id.*)

**C.     State Agency Reports**

**1.         Mental Impairments**

On September 4, 2016, Stanley Kravitz, Ph.D., found Brotherwood had mild restrictions of daily living, mild difficulties in maintaining social functioning, and moderate difficulties in maintaining concentration, persistence, or pace.  (*Id.* at 95-96.)  Dr. Kravitz opined Brotherwood could "perform simple routine 1-3 step tasks, but requires support and explanation to carry out detailed instructions."  (*Id.* at 101.)  Brotherwood also required "occasional flexibility with task, break and shift changes and occasional supervision to maintain quality and productivity."  (*Id.*)  Given Brotherwood's "low average intelligence and psych symptoms," Dr. Kravitz opined Brotherwood was limited to completing tasks "in a static environment in which changes are infrequent and well-explained."  (*Id.*)  Dr. Kravitz further opined Brotherwood could "perform simple routine 1-3 step tasks, but requires support and explanation for major changes, gradually implemented."  (*Id.*)

On November 21, 2016, Vicki Warren, Ph.D., affirmed Dr. Kravitz's findings on reconsideration. (*Id.* at 112-13, 118.)

**2.         Physical Impairments**

On August 2, 2016, Theresa March, D.O., found Brotherwood could lift and/or carry 20 pounds occasionally and 10 pounds frequently.  (*Id.* at 98.)  Dr. March opined Brotherwood could sit and stand/walk for about six hours in an eight-hour work day.  (*Id.*)  Brotherwood's ability to push and pull was unlimited, other than shown for lift and/or carry.  (*Id.*)  Dr. March further opined Brotherwood had an unlimited ability to climb ramps and stairs, but could never climb ladders, ropes, or scaffolds.  (*Id.*)

Brotherwood could frequently stoop, kneel, and crawl.  (*Id.*)  His ability to balance and crouch was unlimited.  (*Id.*)  Dr. March further opined Brotherwood needed to avoid concentrated exposure to extreme heat and avoid even moderate exposure to hazards (machinery, heights, etc.).  (*Id.* at 99.)

On November 22, 2016, Sreenivas Venkatachala, M.D., affirmed the findings regarding Brotherwood's ability to lift/carry, sit, stand/walk, and push/pull on reconsideration.  (*Id.* at 115-16.)  Dr. Venkatachala opined Brotherwood could occasionally climb ramps and stairs, but could never climb ladders, ropes, or scaffolds.  (*Id.* at 115.)  Brotherwood could occasionally stoop and crawl, and frequently balance, kneel, and crouch.  (*Id.*)  Dr. Venkatachala further opined Brotherwood needed to avoid concentrated exposure to extreme heat and avoid all exposure to hazards (machinery, heights, etc.).  (*Id.* at 116.)

**D.  Hearing Testimony**

During the February 27, 2018 hearing, Brotherwood testified to the following:

- He lives with his wife and three children in a house.  (*Id.* at 39.)  His wife works as a registered nurse.  (*Id.*)  He holds a valid driver's license and drives.  (*Id.* at 40-41.)  He has no issues driving.  (*Id.* at 41.)  He can read, write, sign his name, make change at a store, and operate a checking account, although his wife does that.  (*Id.*)

- He stopped working in April 2016 because his cognitive impairments really became an issue.  (*Id.*)  He was also having back issues.  (*Id.* at 42.)  His doctor put him on short-term medical leave.  (*Id.*)  He was not any better when his short-term disability ended than when he was put on short-term disability.  (*Id.*)  He wanted to return to work, but his employer put him on unpaid leave for six months and then terminated him.  (*Id.*)

- Despite the notations in the record, he does not work as a butcher.  (*Id.* at 48.)  He goes into his father-in-law's butcher shop to hang out and pass the time, but he does not go in and work there.  (*Id.*)

- He feels he cannot work because he has a hard time learning things and keeping track of minor things.  (*Id.*)  He has a hard time feeding his children or remembering to feed them, and so he does not know how he would begin to learn something new when he was such a hard time remembering and comprehending things.  (*Id.* at 48-49.)  He also has pain in his back if he is on his feet too much.  (*Id.* at 49.)

23

- He receives counseling at Coleman Professional. (*Id.* at 50.) He believes the counseling is helping and he feels better about himself sometimes. (*Id.* at 50-51.) Sometimes he feels better. (*Id.* at 51.) His psychiatrist is working on finding a good antidepressant that will make him feel better overall. (*Id.*) He sees a counselor at least once a month. (*Id.* at 51, 57.)

- He has sharp pains in his back from time to time when standing. (*Id.* at 52-53.) His leg no longer bothers him, but now his back bothers him and he is not sure he could stand for four hours now. (*Id.* at 53-54.)

- He sees Dr. Natasha Alexander, his neurologist, for treatment of his multiple sclerosis, as well as his family doctor, regularly. (*Id.* at 55-56.) When he has MS exacerbations, Dr. Alexander will prescribe steroid IV treatments. (*Id.* at 56.) However, he has not had any problems for the past year or two because his medication is working. (*Id.*) He sees his family doctor at least once a year. (*Id.*)

- He is taking Tecfidera twice a day for his multiple sclerosis. (*Id.*) The nurse practitioner switched his antidepressant from Wellbutrin to another medication that morning. (*Id.*) He takes Modafinil for fatigue. (*Id.*)

- He can walk for an hour or two before he needs a break. (*Id.* at 58.) He can lift fifteen to twenty pounds. (*Id.*)

- On a typical day, he wakes up his children and helps get them on the bus. (*Id.*) He does as much as he can around the house and takes care of the dogs. (*Id.*) He cooks a little. (*Id.*) He can vacuum and helps with the laundry sometimes. (*Id.* at 59.) He sometimes goes grocery shopping with his wife. (*Id.*) He goes to church at least once a month. (*Id.*) He visits his parents once or twice a week. (*Id.*) He does not go out to eat very often. (*Id.*) He may go once or twice a month, but it is to McDonald's or somewhere to get something for his children to eat in a pinch. (*Id.* at 59-60.) He likes to restore old skillets. (*Id.* at 60.) He also likes to fish, but he does not get to do so very often. (*Id.*) He sells the skillets he restores, but it is not very profitable. (*Id.*) He made less than $100 selling his skillets from last May to November. (*Id.*) His family has three dogs, a cat, and a fish aquarium. (*Id.*) He and his children share the responsibilities of feeding them. (*Id.*)

- He cannot follow directions on how to assemble something for his children. (*Id.* at 62.) He needs to stop and reread them and then do it again. (*Id.*)

The VE testified Brotherwood had past work as a warehouse worker and supervisor. (*Id.* at 64.)

The ALJ then posed the following hypothetical question:

> Please assume a hypothetical individual of the claimant's age, education and relevant vocational background. He is able to do light work except he can occasionally climb ramps and stairs; never climb ladders, ropes

24

> or scaffolds; and he can frequently balance, stoop, kneel, crouch and
> crawl. In addition, he can never work at unprotected heights or around
> moving dangerous mechanical parts. He is to use no foot controls with
> the right foot. He is also limited to performing simple, routine and
> repetitive tasks, but not at a production rate pace, for example, no
> assembly line work. He is limited to simple/work-related decisions. He
> is limited to tolerating few changes in the work setting defined as
> routine job duties that remain static and are performed in a stable,
> predictable work setting. Any necessary changes need to occur
> infrequently, excuse me, and be adequately and easily explained. He is
> to avoid all exposure to concentrated heat . . . All right, hold on for one
> second, yep, that's it. All right. Okay. Can the hypothetical individual I
> just described perform any of the past work as actually performed or
> generally performed in the national economy? . . .

(*Id.* at 64-65.)

The VE testified the hypothetical individual would not be able to perform Brotherwood's past work as a warehouse worker and supervisor.  (*Id.* at 65-66.)  The VE further testified the hypothetical individual would be able to perform other representative jobs in the economy, such as: cashier; cleaner, housekeeping; and photocopying machine operator.  (*Id.*)

The ALJ then posed a second hypothetical, keeping all other limitations listed in the first hypothetical but changing the exertion level to sedentary.  (*Id.* at 66-67.)  The VE testified the hypothetical individual could perform representative jobs in the economy, such as account clerk and document preparer, microfilming.  (*Id.* at 67.)

In response to questions from the ALJ, the VE testified being off-task more than 25% of the work day or absent two or more days a month would be work-preclusive.  (*Id.* at 68.)

### III.    STANDARD FOR DISABILITY

In order to establish entitlement to DIB under the Act, a claimant must be insured at the time of disability and must prove an inability to engage "in substantial gainful activity by reason of any medically determinable physical or mental impairment," or combination of impairments, that can be expected to

25

"result in death or which has lasted or can be expected to last for a continuous period of not less than 12 months." 20 C.F.R. §§ 404.130, 404.315 and 404.1505(a).

A claimant is entitled to a POD only if: (1) he had a disability; (2) he was insured when he became disabled; and (3) he filed while he was disabled or within twelve months of the date the disability ended. 42 U.S.C. § 416(i)(2)(E); 20 C.F.R. § 404.320.

The Commissioner reaches a determination as to whether a claimant is disabled by way of a five-stage process. 20 C.F.R. § 404.1520(a)(4). *See also Ealy v. Comm'r of Soc. Sec.*, 594 F.3d 504, 512 (6th Cir. 2010); *Abbott v. Sullivan*, 905 F.2d 918, 923 (6th Cir. 1990). First, the claimant must demonstrate that he is not currently engaged in "substantial gainful activity" at the time of the disability application. 20 C.F.R. § 404.1520(b). Second, the claimant must show that he suffers from a "severe impairment" in order to warrant a finding of disability. 20 C.F.R. § 404.1520(c). A "severe impairment" is one that "significantly limits . . . physical or mental ability to do basic work activities." *Abbot*, 905 F.2d at 923. Third, if the claimant is not performing substantial gainful activity, has a severe impairment that is expected to last for at least twelve months, and the impairment, or combination of impairments, meets or medically equals a required listing under 20 CFR Part 404, Subpart P, Appendix 1, the claimant is presumed to be disabled regardless of age, education or work experience. *See* 20 C.F.R. § 404.1520(d). Fourth, if the claimant's impairment or combination of impairments does not prevent him from doing his past relevant work, the claimant is not disabled. 20 C.F.R. § 404.1520(e)-(f). For the fifth and final step, even if the claimant's impairment does prevent him from doing his past relevant work, if other work exists in the national economy that the claimant can perform, the claimant is not disabled. 20 C.F.R. § 404.1520(g) and 404.1560(c).

Here, Brotherwood was insured on his alleged disability onset date, April 15, 2016, and remains insured through December 31, 2021, his date last insured ("DLI.") (Tr. 15.) Therefore, in order to be

26

entitled to POD and DIB, Brotherwood must establish a continuous twelve-month period of disability commencing between these dates.  Any discontinuity in the twelve-month period precludes an entitlement to benefits.  *See Mullis v. Bowen*, 861 F.2d 991, 994 (6th Cir. 1988); *Henry v. Gardner*, 381 F.2d 191, 195 (6th Cir. 1967).

## IV.    SUMMARY OF COMMISSIONER'S DECISION

The ALJ made the following findings of fact and conclusions of law:

1.    The claimant meets the insured status requirements of the Social Security Act through December 31, 2021.

2.    The claimant has not engaged in substantial gainful activity since April 15, 2016, the alleged onset date (20 CFR 404.1571 *et seq.*)

3.    The claimant has the following severe impairments: relapsing remitting multiple sclerosis, mild arthritis in the lumbar spine, lumbar radiculopathy, degenerative disc disease at L5-S1, meralgia paresthetica right side, nocturnal hypoxemia, neurocognitive disorder, anxiety disorder, and depression disorder (20 CFR 404.1520(c)).

4.    The claimant does not have an impairment or combination of impairments that meets or medically equals the severity of one of the listed impairments in 20 CFR Part 404, Subpart P, Appendix 1 (20 CFR 404.1520(d), 404.1525 and 404.1526).

5.    After careful consideration of the entire record, the undersigned finds that the claimant has the residual functional capacity to perform light work as defined in 20 CFR 404.1567(b) except the claimant can occasionally climb ramps and stairs; never climb ladders, ropes, or scaffolds; and can frequently balance, stoop, kneel, crouch, and crawl.  In addition, he can never work at unprotected heights, or around moving dangerous mechanical parts.  He is to use no foot controls with the right foot.  He is also limited to performing simple, routine and repetitive tasks, but not at a production rate pace, for example no assembly line work.  He is limited to simple work-related decisions.  He is limited to tolerating few changes in the work setting, defined as routine job duties that remain static and are performed in a stable, predictable work setting.  Any necessary changes need to occur infrequently, and be adequately and easily explained.  Finally, he is to avoid all exposure to concentrated heat.

6.    The claimant is unable to perform past relevant work (20 CFR 404.1565).

7.     The claimant was born on August **, 1974 and was 41 years old, which is defined as a younger individual age 18-49, on the alleged disability onset date (20 CFR 404.1563).

8.     The claimant has at least a high school education and is able to communicate in English (20 CFR 404.1564).

9.     Transferability of job skills is not material to the determination of disability because using the Medical-Vocational Rules as a framework supports a finding that the claimant is "not disabled," whether or not the claimant has transferable job skills (See SSR 82-41 and 20 CFR Part 404, Subpart P, Appendix 2).

10.    Considering the claimant's age, education, work experience, and residual functional capacity, there are jobs that exist in significant numbers in the national economy that the claimant can perform (20 CFR 404.1569 and 404.1569(a)).

11.    The claimant has not been under a disability, as defined in the Social Security Act, from April 15, 2016, through the date of this decision (20 CFR 404.1520(g)).

(Tr. 17-27.)

## V.  STANDARD OF REVIEW

"The Social Security Act authorizes narrow judicial review of the final decision of the Social Security Administration (SSA)."  *Reynolds v. Comm'r of Soc. Sec.*, 424 F. App'x 411, 414 (6th Cir. 2011). Specifically, this Court's review is limited to determining whether the Commissioner's decision is supported by substantial evidence and was made pursuant to proper legal standards.  *See Ealy v. Comm'r of Soc. Sec.*, 594 F.3d 504, 512 (6th Cir. 2010); *White v. Comm'r of Soc. Sec.*, 572 F.3d 272, 281 (6th Cir. 2009).  Substantial evidence has been defined as "'more than a scintilla of evidence but less than a preponderance; it is such relevant evidence as a reasonable mind might accept as adequate to support a conclusion.'"  *Rogers v. Comm'r of Soc. Sec.*, 486 F.3d 234, 241 (6th Cir. 2007) (quoting *Cutlip v. Sec'y of Health and Human Servs.*, 25 F.3d 284, 286 (6th Cir. 1994)).  In determining whether an ALJ's findings are supported by substantial evidence, the Court does not review the evidence *de novo*, make credibility

28

determinations, or weigh the evidence. *Brainard v. Sec'y of Health & Human Servs.*, 889 F.2d 679, 681 (6th Cir. 1989).

Review of the Commissioner's decision must be based on the record as a whole. *Heston v. Comm'r of Soc. Sec.*, 245 F.3d 528, 535 (6th Cir. 2001). The findings of the Commissioner are not subject to reversal, however, merely because there exists in the record substantial evidence to support a different conclusion. *Buxton v. Halter*, 246 F.3d 762, 772-73 (6th Cir.2001) (citing *Mullen v. Bowen*, 800 F.2d 535, 545 (6th Cir. 1986)); *see also Her v. Comm'r of Soc. Sec.*, 203 F.3d 388, 389-90 (6th Cir. 1999) ("Even if the evidence could also support another conclusion, the decision of the Administrative Law Judge must stand if the evidence could reasonably support the conclusion reached."). This is so because there is a "zone of choice" within which the Commissioner can act, without the fear of court interference. *Mullen*, 800 F.2d at 545 (citing *Baker v. Heckler*, 730 F.2d 1147, 1150 (8th Cir. 1984)).

In addition to considering whether the Commissioner's decision was supported by substantial evidence, the Court must determine whether proper legal standards were applied. Failure of the Commissioner to apply the correct legal standards as promulgated by the regulations is grounds for reversal. *See, e.g., White v. Comm'r of Soc. Sec.*, 572 F.3d 272, 281 (6th Cir. 2009); *Bowen v. Comm'r of Soc. Sec.*, 478 F.3d 742, 746 (6th Cir. 2006) ("Even if supported by substantial evidence, however, a decision of the Commissioner will not be upheld where the SSA fails to follow its own regulations and where that error prejudices a claimant on the merits or deprives the claimant of a substantial right.").

Finally, a district court cannot uphold an ALJ's decision, even if there "is enough evidence in the record to support the decision, [where] the reasons given by the trier of fact do not build an accurate and logical bridge between the evidence and the result." *Fleischer v. Astrue*, 774 F. Supp. 2d 875, 877 (N.D. Ohio 2011) (quoting *Sarchet v. Chater,* 78 F.3d 305, 307 (7th Cir.1996); *accord Shrader v. Astrue*, 2012

WL 5383120 (E.D. Mich. Nov. 1, 2012) ("If relevant evidence is not mentioned, the Court cannot determine if it was discounted or merely overlooked."); *McHugh v. Astrue*, 2011 WL 6130824 (S.D. Ohio Nov. 15, 2011); *Gilliam v. Astrue*, 2010 WL 2837260 (E.D. Tenn. July 19, 2010); *Hook v. Astrue*, 2010 WL 2929562 (N.D. Ohio July 9, 2010).

## VI.  ANALYSIS

### A.  First Assignment of Error: The ALJ's Actions, Findings, and Conclusions Lack Substantial Evidence

Brotherwood raises two distinct arguments under this first assignment of error.  First, he asserts the ALJ erred in her evaluation of Brotherwood's mental impairments under the "paragraph B" criteria at Step Three.  (Doc. No. 9 at 3-4.)   Second, he argues the ALJ erred in evaluating Brotherwood's subjective symptoms.  (*Id.* at 4-5.)  The Court will address each of these arguments in turn.

#### 1.  Step Three

Brotherwood asserts the ALJ erred in finding Brotherwood's limitations in his ability to understand and remember, as well as his ability to concentrate, persist, and maintain pace, were "moderate."  (*Id.* at 3-4.)  Brotherwood argues the ALJ's finding of moderate limitation in his ability to understand and remember "is contrary to the evidence as a whole."  (*Id.* at 4.)  Brotherwood further argues the ALJ's rationale for finding Brotherwood moderately limited in his ability to concentrate, persist, and maintain pace is "wholly underdeveloped."

The Commissioner asserts substantial evidence supports the ALJ's RFC.  (Doc. No. 12 at 8.)  The Commissioner argues Brotherwood's "RFC argument really only asks this Court to reweigh the evidence in his favor, and accordingly, the argument should fail."  (*Id.* at 9.)

At the third step in the disability evaluation process, a claimant will be found disabled if his impairment meets or equals one of the Listing of Impairments.  *See* 20 C.F.R. § 404.1520(a)(4)(iii);

*Turner v. Comm'r of Soc. Sec.*, 381 F. App'x 488, 491 (6th Cir. 2010).  The Listing of Impairments, located at Appendix 1 to Subpart P of the regulations, describes impairments the Social Security Administration considers to be "severe enough to prevent an individual from doing any gainful activity, regardless of his or her age, education, or work experience."  20 C.F.R. § 404.1525(a).  Essentially, a claimant who meets the requirements of a Listed Impairment, as well as the durational requirement, will be deemed conclusively disabled and entitled to benefits.

Each listing specifies "the objective medical and other findings needed to satisfy the criteria of that listing."  20 C.F.R. § 404.1525(c)(3).  It is the claimant's burden to bring forth evidence to establish that his impairments meet or are medically equivalent to a listed impairment.  *See e.g. Lett v. Colvin*, No. 1:13 CV 2517, 2015 WL 853425, at *15 (N.D. Ohio Feb. 26, 2015).  A claimant must satisfy all of the criteria to "meet" the listing.  *Rabbers v. Comm'r of Soc. Sec.*, 582 F.3d 647, 652 (6th Cir. 2009).  "An impairment that manifests only some of those criteria, no matter how severely, does not qualify."  *Sullivan v. Zebley*, 493 U.S. 521, 530, 110 S.Ct. 885, 107 L.Ed.2d 967 (1990).  A claimant is also disabled if his impairment is the medical equivalent of a listing, 20 C.F.R. § 404.1525(c)(5, which means it is "at least equal in severity and duration to the criteria of any listed impairment."  20 C.F.R. § 404.1526(a).

Where the record raises a "substantial question" as to whether a claimant could qualify as disabled under a listing, an ALJ must compare the medical evidence with the requirements for listed impairments in considering whether the condition is equivalent in severity to the medical findings for any Listed Impairment.  *See Reynolds v. Comm'r of Soc. Sec.*, 424 F. App'x 411, 414-15 (6th Cir. 2011).  In order to conduct a meaningful review, the ALJ must make sufficiently clear the reasons for her decision.  *Id.* at 416-17.  *See also Harvey v. Comm'r of Soc. Sec.*, No. 16-3266, 2017 WL 4216585, at *5 (6th Cir. March 6, 2017) ("In assessing whether a claimant meets a Listing, the ALJ must 'actually evaluate the evidence,' compare it to the requirements of the relevant Listing, and provide an 'explained conclusion, in order to

31

facilitate meaningful judicial review.'") (quoting *Reynolds*, 424 F. App'x at 416); *Joseph v. Comm'r of Soc. Sec.*, 741 F. App'x 306, 311 (6th Cir. 2018) (same).  *See also Snyder v. Comm'r of Soc. Sec.*, No. 5:13cv2360, 2014 WL 6687227, at *10 (N.D. Ohio Nov. 26, 2014) ("Although it is the claimant's burden of proof at Step 3, the ALJ must provide articulation of his Step 3 findings that will permit meaningful review. . . This court has stated that 'the ALJ must build an accurate and logical bridge between the evidence and his conclusion.'") (quoting *Woodall v. Colvin*, 2013 WL 4710516 at *10 (N.D. Ohio Aug. 29, 2013).

Here, the ALJ found the following at Step Three with respect to Brotherwood's mental impairments:

> The severity of the claimant's mental impairments, considered singly and in combination, do not meet or medically equal the criteria of listings 12.02, 12.04, and 12.06.  In making this finding, the undersigned has considered whether the "paragraph B" criteria are satisfied. To satisfy the "paragraph B" criteria, the mental impairments must result in at least one extreme or two marked limitations in a broad area of functioning which are: understanding, remembering, or applying information; interacting with others; concentrating, persisting, or maintaining pace; or adapting or managing themselves. A marked limitation means functioning in this area independently, appropriately, effectively, and on a sustained basis is seriously limited. An extreme limitation is the inability to function independently, appropriately or effectively, and on a sustained basis.
>
> In understanding, remembering, or applying information, the claimant has a moderate limitation. In so finding, the undersigned has assessed the claimant's ability to learn, recall, and use information to perform work activities. The claimant has alleged that he has difficulty remembering and understanding. However, the claimant is able to drive, go out alone, shop in stores, and manage money (HT, Exhibits 5F, 11F). The claimant also performs household chores including vacuuming and laundry (HT). Treatment notes show ongoing complaints of difficulty with memory (Exhibits 2F/15, 2F/11, 5F, 11F, 13F/l). However, during the consultative examination in August 2016, the claimant's recent memory appeared marginally adequate. He recalled one of three objects on a simple registration task after five minutes (Exhibit 5F). The claimant underwent neuropsychological testing in June 2017 and it as [sic] noted that his verbal comprehension measures had improved (Exhibit 11F). At the

hearing, the claimant testified that he wakes his kids up for school and cares for his dogs. Accordingly, a moderate limitation is found in this area.

In interacting with others, the claimant has a mild limitation. This rating is based on examination of the claimant's ability to get along with others, i.e., whether he initiates social contact with others, communicates clearly with others, and interacts and actively participates in group activities. During the consultative examination in August 2016, the claimant reported that he visits with a few friends weekly and with family twice a week. He also reported that he talks on the phone with his mother (Exhibit 5F). Treatment notes indicate that the claimant has a good relationship with his father in law (Exhibits 13F/2, 16F/3). At the hearing, the claimant testified that he goes to church at least on a monthly basis. He also testified that he occasionally goes out to eat with his family. Furthermore, treatment notes describe the claimant as cooperative (Exhibits 5F, 11F, 16F/16). Accordingly, a mild limitation is found in this area.

With regard to concentrating, persisting, or maintaining pace, the claimant has a moderate limitation. In making this determination, the undersigned has evaluated the claimant's ability to sustain work, using appropriate production standards, in either real or simulated work tasks. The claimant alleges that he has difficulty concentrating and completing tasks, but he has the concentration necessary to manage his money, prepare meals, shop, and attend to his other activities of daily living (HT, Exhibits 5F, 11F). The claimant reported that his hobbies include restoring cask iron skillets, which require at least some amount of concentration (HT, Exhibit SF). Accordingly, a moderate limitation is found in this area.

As for adapting or managing oneself, the claimant has experienced a mild limitation. This rating is based on the claimant's ability to regulate emotions, control behavior, and maintain his well- being. The claimant is able to perform personal care tasks, take care of his kids, and helps care for his pets. The claimant also reported an ability to shop, go out alone, do laundry, clean the house, and manage money (HT, Exhibit SF). Accordingly, a mild limitation is found in this area.

Because the claimant's mental impairments do not cause at least two "marked" limitations or one "extreme" limitation, the "paragraph B" criteria are not satisfied.

The undersigned has also considered whether the "paragraph C" criteria are satisfied. In this case, the evidence fails to establish the presence of the "paragraph C" criteria. The claimant's activities of daily living do not show the claimant has only a minimal capacity to adjust to changes (HT, Exhibits 5F, 11F).

33

> The limitations identified in the "paragraph B" criteria are not a residual functional capacity assessment but are used to rate the severity of mental impairments at steps 2 and 3 of the sequential evaluation process. The mental residual functional capacity assessment used at steps 4 and 5 of the sequential evaluation process requires a more detailed assessment. The following residual functional capacity assessment reflects the degree of limitation the undersigned has found in the "paragraph B" mental functional analysis.

(Tr. 18-20.)

Brotherwood makes no specific argument as to how he meets or equals a listing. (Doc. No. 9 at 3-5.) Nor does he argue whether the ALJ should have found his abilities to understand, remember, concentrate, persist, and maintain pace to be "marked" or "extreme." (*Id.*) Rather, he argues that with respect to his ability to understand and remember, the ALJ's finding of moderate impairment was against "the evidence as a whole" because Brotherwood "complained numerous times to his providers that his ability to remember and understand was significantly limited." (*Id.* at 4.) But the ALJ discussed, at both Step Three and in the RFC analysis, the treatment records reflecting "ongoing complaints of difficulty with memory." (Tr. 18, 22-24.) The ALJ weighed that evidence against other evidence in the record, which she supported with citations, and determined Brotherwood had only a moderate limitation in his ability to understand, remember, or apply information. (*Id.* at 18-19.) It is not for this Court to reweigh the evidence. The fact that Brotherwood would have weighed the evidence differently does not mean the ALJ's finding lacked substantial evidence.

Brotherwood also argues that the ALJ erred in finding Brotherwood had only a moderate limitation in his ability to concentrate, persist, or maintain pace. (Doc. No. 9 at 4.) He asserts the ALJ "simply state[d]" in her decision that she based her conclusion on Brotherwood's ability to restore cast iron skillets, and therefore her rationale in support of her finding was "wholly undeveloped." (*Id.*) Contrary to Brotherwood's selective parsing of the ALJ's decision, the ALJ provided several reasons in support of her

34

finding that Brotherwood had a moderate impairment in his ability to concentrate, persist, or maintain pace.  (Tr. 19.)  She discussed and weighed conflicting evidence, supported by citations to the record. (*Id.*)  Again, it is not for this Court to reweigh the evidence, and the fact Brotherwood would have weighed the evidence differently does not mean the ALJ's finding lacked substantial evidence.

There is no error in the ALJ's Step Three findings.

### 2.  Subjective symptom evaluation

Brotherwood argues the ALJ erred in her evaluation of Brotherwood's subjective symptoms "by focusing solely on [his] testimony that he 'attends his personal hygiene and cares for pets.'"  (Doc. No. 9 at 4) (citation omitted).  Brotherwood argues the ALJ cherry-picked the record by "selectively" choosing evidence for a finding of non-disability.  (*Id.*)

The Commissioner responds it is Brotherwood who cherry-picks the record and the ALJ's decision to support his arguments, and that a "complete reading of the ALJ's decision . . . shows she considered many 'credibility factors' . . . ."  (Doc. No. 12 at 13-15.)

When a claimant alleges symptoms of disabling severity, an ALJ must follow a two-step process for evaluating these symptoms.  *See, e.g., Moore v. Comm'r of Soc. Sec.*, 573 F. App'x 540, 542 (6th Cir. 2014); *Massey v. Comm'r of Soc. Sec.*, 409 F. App'x 917, 821 (6th Cir. 2011).  First, the ALJ must determine if there is an underlying medically determinable physical or mental impairment that could reasonably be expected to produce a claimant's symptoms.  Second, the ALJ "must evaluate the intensity and persistence of [the claimant's] symptoms so that [the ALJ] can determine how [those] symptoms limit [the claimant's] capacity for work."  20 C.F.R. § 404.1529(c)(1).  *See also* SSR 16-3p, 2016 WL 1119029 (March 16, 2016).

If the claimant's allegations are not substantiated by the medical record, the ALJ must evaluate the individual's statements based on the entire case record.  The evaluation of a claimant's subjective

complaints rests with the ALJ.  *See Siterlet v. Sec'y of Health & Human Servs.*, 823 F.2d 918, 920 (6th Cir. 1987); *Rogers v. Comm'r of Soc. Sec.*, 486 F.3d 234, 248 (6th Cir. 2007) (noting that "credibility determinations regarding subjective complaints rest with the ALJ").  In evaluating a claimant's symptoms, the ALJ must look to medical evidence, statements by the claimant, other information provided by medical sources, and any other relevant evidence on the record.  Beyond medical evidence, there are seven factors that the ALJ should consider.[4]  The ALJ need not analyze all seven factors but should show that he considered the relevant evidence.  *See Cross v. Comm'r of Soc. Sec.*, 373 F. Supp. 2d 724, 733 (N.D. Ohio 2005); *Masch v. Barnhart*, 406 F. Supp. 2d 1038, 1046 (E.D. Wis. 2005).  The ALJ's "decision must contain specific reasons for the weight given to the individual's symptoms . . . and be clearly articulated so the individual and any subsequent reviewer can assess how the adjudicator evaluated the individual's symptoms."  SSR 16-3p, 2016 WL 1119029; *see also Felisky v. Bowen*, 35 F.2d 1027, 1036 (6th Cir. 1994) ("If an ALJ rejects a claimant's testimony as incredible, he must clearly state his reason for doing so.").  While a reviewing court gives deference to an ALJ's credibility determination, "the ALJ's credibility determination will not be upheld if it is unsupported by the record or insufficiently explained." *Carr v. Comm'r of Soc. Sec.*, No. 3:18CV1639, 2019 WL 2465273, at *10 (N.D. Ohio April 24, 2019) (citing *Rogers*, 486 F.3d at 248-49), *report and recommendation adopted by* 2019 WL 3752687 (N.D. Ohio Aug. 8, 2019).

The ALJ found as follows with respect to Brotherwood's subjective symptoms:

---

[4] The seven factors are: (1) the individual's daily activities; (2) the location, duration, frequency, and intensity of the individual's pain; (3) factors that precipitate and aggravate the symptoms; (4) the type, dosage, effectiveness, and side effects of any medication the individual takes or has taken to alleviate pain or other symptoms; (5) treatment, other than medication, the individual receives or has received for relief of pain or other symptoms; (6) any measures other than treatment the individual uses or has used to relieve pain or other symptoms; and (7) any other factors concerning the individual's functional limitations and restrictions due to pain or other symptoms.  *See* SSR 16-3p, 2016 WL 1119029, at *7.

After careful consideration of the evidence, the undersigned finds that the claimant's medically determinable impairments could reasonably by expected to cause the alleged symptoms; however, the claimant's statements concerning the intensity, persistence and limiting effects of these symptoms are not entirely consistent with the medical evidence and other evidence in the record for the reasons explained in this decision.

* * *

In sum, the above residual functional capacity assessment is supported by Dr. Laddle, Dr. Wuebhker, the State agency consultant's findings, the claimant's activities of daily living, and the medical record and other evidence of record.  Nothing in the claimant's clinical signs suggests that the residual functional capacity assessment is unreasonable. Nor does the medical record reflect a treatment regimen inconsistent with such limitations. The medical evidence and other evidence of record suggest that the claimant can sustain a greater capacity than he described at the hearing. The claimant has received only conservative treatment for his physical impairments. He has not had a multiple sclerosis exacerbation since 2014. His right leg pain has resolved and he is able to sleep well with oxygen. While, the claimant continues to complain of back pain, and there has been tenderness noted during some physical examinations, he maintains a normal gait and 5/5 strength. As for the claimant's mental impairments, testing in June 2017 showed improved in the claimant's cognitive functioning. The claimant resisted counseling, but his symptoms improved once he started treatment. In addition, the undersigned notes that several times in the record it is noted that the claimant is working part time for his father in law at a butcher shop. The record also notes that the claimant works restoring cask irons, performs household chores, and cares for his kids and dogs. Given this evidence, the undersigned concludes that the claimant retains the ability, despite his impairments, to perform the above- referenced range of light work within the limitations noted in the residual functional capacity determined above.

(Tr. 21, 25-26.)

Brotherwood argues the ALJ failed to mention in her decision that he "testified during the hearing to multiple issues with his cognitive abilities, including his inability to keep up with the pace at work, inability to learn new material, issues concentrating, constantly rereading instructions and asking for verbal instructions multiple times."  (Doc. No. 9 at 4-5) (citations omitted).  But a careful reading of shows the ALJ accounted for much of this evidence in her decision.  (Tr. 20, 22-26.)  Furthermore, the

37

ALJ's decision shows she considered several of the factors used to evaluate subjective symptoms, including Brotherwood's daily activities, the effectiveness of his medication, and the treatment received for his symptoms.  (*Id.* at 25-26.)  Substantial evidence supports the ALJ's subjective symptom evaluation.

**B.**     **Second Assignment of Error: The ALJ Failed to Properly Evaluate Opinion Evidence**

Brotherwood asserts the ALJ failed to properly evaluate the evidence when she "state[d] multiple times that the June 2017 neuropsychological examination showed an 'improvement' in his condition" but failed to mention "the 'improvement' in his cognitive function [was] from the 1st percentile to the 2nd percentile."  (Doc. No. 9 at 5.)  In addition, Brotherwood asserts, without any further explanation or argument, that none of the ALJ's "determinations for the weight she gave for providers" was in accordance with the regulations because the ALJ failed to "properly discuss" the regulatory factors for controlling weight when making her determination for the weight given.  (*Id.*)

The Commissioner responds first that there are no treating source opinions in the record, and as a result, "the ALJ was not required to consider assigning controlling weight to any opinion," nor was she required to give "good reasons" for the weight assigned to any opinion.  (Doc. No. 12 at 16.)  In addition, because there was no treating source opinion, "the ALJ properly gave weight to the opinions of the state agency reviewing and consulting physician's [sic] opinions, and this alone is enough to substantially support the ALJ's decision."  (Doc. No. 12 at 16-17) (citation omitted).

As the Sixth Circuit has explained, "'[t]he Commissioner has elected to impose certain standards on the treatment of medical source evidence.'"  *Gayheart v. Comm'r of Soc. Sec.*, 710 F.3d 365, 375 (6th Cir. 2013) (citing *Cole v. Astrue*, 661 F.3d 931, 937 (6th Cir. 2011)).  Medical opinions are to be weighed by the process set forth in 20 C.F.R. § 404.1527(c), and "[t]he source of the opinion . . . dictates the process by which the Commissioner accords it weight."  *Id.*  "As a general matter, an opinion from a medical source who has examined a claimant is given more weight than that from a source who has not

38

performed an examination (a 'nonexamining source'), *id.* § 404.1502, 404.1527(c)(1), and an opinion from a medical source who regularly treats the claimant (a 'treating source') is afforded more weight than that from a source who has examined the claimant but does not have an ongoing treatment relationship (a 'nontreating source'), *id.* § 404.1502, 404.1527(c)(2)." *Id.* In other words, "'the regulations provide progressively more rigorous tests for weighing opinions as the ties between the source of the opinion and the individual become weaker.'" *Gayheart*, 710 F.3d at 375 (quoting SSR No. 96–6p, 1996 WL 374180, at *2 (Soc. Sec. Admin. July 2, 1996)).[5]

A treating source opinion must be given "controlling weight" if such opinion (1) "is well-supported by medically acceptable clinical and laboratory diagnostic techniques" and (2) "is not inconsistent with the other substantial evidence in [the] case record." *Gayheart*, 710 F.3d at 376; 20 C.F.R. § 404.1527(c)(2). However, "a finding that a treating source medical opinion . . . is inconsistent with the other substantial evidence in the case record means only that the opinion is not entitled to 'controlling weight,' not that the opinion should be rejected." *Blakley v. Comm'r of Soc. Sec.*, 581 F.3d 399 (6th Cir. 2009). Indeed, "[t]reating source medical opinions are still entitled to deference and must be weighed using all of the factors provided in 20 C.F.R. § 404.1527 and 416.927." *Blakley*, 581 F.3d at 408. *See also Gayheart*, 710 F.3d at 376 ("If the Commissioner does not give a treating-source opinion controlling weight, then the opinion is weighed based on the length, frequency, nature, and extent of the treatment relationship, *id.*, as well as the treating source's area of specialty and the degree to which the opinion is consistent with the record as a whole and is supported by relevant evidence, *id.* § 404.1527(c)(2)-(6).")

---

[5] Revised versions of these regulations took effect on March 27, 2017 and apply to disability claims filed on or after that date. *See* 82 F. Reg. 5844 (March 27, 2017). SSR 96-6p has been rescinded and replaced by SSR 17-2p, effective March 27, 2017. *See* Soc. Sec. Rul. No. 17-2p, 2017 WL 3928306 at *1 (Soc. Sec. Admin. Mar. 27, 2017).

If the ALJ determines a treating source opinion is not entitled to controlling weight, "the ALJ must provide 'good reasons' for discounting [the opinion], reasons that are 'sufficiently specific to make clear to any subsequent reviewers the weight the adjudicator gave to the treating source's medical opinion and the reasons for that weight.'" *Rogers v. Comm'r of Soc. Sec.*, 486 F.3d 234, 242 (6th Cir. 2007). *See also Gayheart*, 710 F.3d at 376. The purpose of this requirement is two-fold. First, a sufficiently clear explanation "'let[s] claimants understand the disposition of their cases,' particularly where a claimant knows that his physician has deemed him disabled and therefore 'might be bewildered when told by an administrative bureaucracy that she is not, unless some reason for the agency's decision is supplied.'" *Id.* (quoting *Wilson v. Comm'r of Soc. Sec.*, 378 F.3d 541, 544 (6th Cir. 2004)). Second, the explanation "ensures that the ALJ applies the treating physician rule and permits meaningful appellate review of the ALJ's application of the rule." *Wilson*, 378 F.3d at 544. Because of the significance of this requirement, the Sixth Circuit has held that the failure to articulate "good reasons" for discounting a treating physician's opinion "denotes a lack of substantial evidence, even where the conclusion of the ALJ may be justified based upon the record." *Rogers*, 486 F.3d at 243.

In formulating the RFC, ALJs "are not bound by any findings made by State agency medical or psychological consultants, or other program physicians or psychologists." 20 C.F.R. § 404.1527(e)(2)(i). Nonetheless, because "State agency medical and psychological consultants and other program physicians, psychologists, and other medical specialists are highly qualified physicians, psychologists," ALJs must consider their findings and opinions. *Id.* When doing so, an ALJ "will evaluate the findings using the relevant factors in paragraphs (a) through (d) of this section, such as the consultant's medical specialty and expertise in our rules, the supporting evidence in the case record, supporting explanations the medical or psychological consultant provides, and any other factors relevant to the weighing of the opinions." 20 C.F.R. § 404.1527(e)(2)(ii). Finally, an ALJ "must explain in the decision the weight given to the

40

opinions of a State agency medical or psychological consultant or other program physician, psychologist, or other medical specialist" unless a treating physician's opinion has been accorded controlling weight. *Id.*

First, the pages Brotherwood cites in support of his argument do not stand for the proposition he states.  These pages are from Dr. Ladle's 2015 neuropsychological evaluation and read in part as follows: "His performance on measures of simple verbal attention was in the severely impaired range (<1st %tile).  On measures of verbal concentration, his performance was in the moderately impaired range (2nd %tile)." (Tr. 327, 331.)  Second, the ALJ discussed the June 2017 neuropsychological assessment conducted by Dr. Ladle in detail, including the positive and negative findings in the assessment, in her RFC analysis. (*Id.* at 23-24.)

As the Commissioner correctly notes, no treating source offered an opinion regarding Brotherwood's impairments.  Brotherwood does not argue the ALJ failed to consider and weigh an opinion from an acceptable medical source.  (Doc. No. 9 at 5.)  Furthermore, Brotherwood makes no specific argument about how the ALJ failed to apply the regulatory factors when assigning weight to the opinion evidence in the record, and the Court will not make such arguments for him.  Suffice it to say, the ALJ's decision contains a thorough discussion of the medical evidence in the record, including the opinion evidence, and the ALJ sufficiently explained the weight given to the opinion evidence in the record.

Brotherwood states in his brief he "agrees generally with the summary of medical facts" contained in the ALJ's opinion, and "this appeal involve[s] the ALJ's interpretation of those facts and her opinions based upon them . . . ."  (Doc. No. 9 at 2.)  The Court finds this to be an invitation to reweigh the evidence, which the Court rejects.  Therefore, it is recommended the ALJ's decision be AFFIRMED in its entirety.

41

## VII.    CONCLUSION

For the foregoing reasons, the Magistrate Judge recommends that the Commissioner's final decision be AFFIRMED.

Date: August 5, 2020                                   *s/ Jonathan Greenberg*
                                                        Jonathan D. Greenberg
                                                        United States Magistrate Judge


### OBJECTIONS

**Any objections to this Report and Recommendation must be filed with the Clerk of Court within fourteen (14) days after the party objecting has been served with a copy of this Report and Recommendation.  28 U.S.C. § 636(b)(1). Failure to file objections within the specified time may waive the right to appeal the District Court's order.  *See United States v. Walters*, 638 F.2d 947 (6th Cir. 1981); *Thomas v. Arn*, 474 U.S. 140 (1985), *reh'g denied*, 474 U.S. 1111 (1986).**